No. 29,942.

THE BRIDGEPORT MACHINE COMPANY, *Appellee*, v. DALE E. EARLY, *Defendant* (THE BOUCHER OIL COMPANY, Interpleader, *Appellant*).

(298 Pac. 796.)

Opinion filed May 9, 1931.

*John Madden* and *John Madden, Jr.,* both of Wichita, for the appellant.
*D. W. Eaton,* of Wichita, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action by the plaintiff against Dale E. Early to recover the sum of $5,154.18 on a check which he had issued to plaintiff on November 15, 1929, and which was dishonored by the bank on which it was drawn because of insufficient funds.

The action was begun on December 12, 1929, and on the following day garnishment process issued to the Continental Oil Company, which answered that it did not then owe Early any money and held no assets belonging to him, but that it did have a business transaction with him to this effect: On July 5, 1929, the garnishee and Early made a contract wherein it was agreed that Early as contractor should drill, case and complete an oil and gas well to the depth of 4,250 feet for the consideration of $4 per foot, unless the garnishee should order drilling operations stopped at a lesser depth. The drilling rig and certain specified equipment were to be supplied by the garnishee and it was likewise to pay for ordinary repairs. Early, the contractor, was to furnish the rest of the equipment for the prosecution of the enterprise.

On December 20, 1929, the Boucher Oil Company of Oklahoma filed a verified interplea in the action, alleging that the drilling contract which had been effected between the garnishee and Early was in fact made by Early as an officer and representative of the Boucher Oil Company, interpleader, and in its behalf; that Early had no personal interest in the contract; that he had prosecuted the work of drilling the well with the tools and equipment of the Boucher Oil Company; that it had expended large sums of money in the performance of the contract; and that it was entitled to the agreed consideration of $4 per foot for the drilling, totaling $16,812.

On a showing satisfactory to the court and the parties concerned the amount due for the drilling of the well (which was completed on January 5, 1930) less the sum garnished in this action was paid over

to the Boucher Oil Company; and this litigation proceeded to a determination of the rights of precedence between plaintiff and the interpleader.

Plaintiff's answer to the interplea traversed all its material allegations which conflicted with the rights asserted by plaintiff concerning its claim to the sum held by the garnishee. Plaintiff set up the written contract between Early and the garnishee, which specifically provided that the contract could not be assigned by Early nor the drilling sublet by him without the written consent of the garnishee. No such consent had been given at the time the service of garnishment was made on December 13, 1929.

The cause was tried by the court which made findings of fact, the most significant of which were that no notice of any assignment of the contract by Early to the Boucher Oil Company had been given to the Continental Oil Company prior to the service of garnishment on December 13, 1929; that at no time prior to December 28, 1929, did the garnishee have a right to pay any money due Early to the Boucher Oil Company; that at no time prior to the latter date had there been any assignment of the contract by Early in conformity with its specified terms; and that the plaintiff never had any notice or knowledge that the interpleader claimed an interest in the drilling contract until after the institution of the garnishment proceedings.

On these findings of fact and on conclusions of law deduced therefrom the trial court rendered judgment for plaintiff.

The Boucher Oil Company, interpleader, appeals, its main contention being that the provision in the drilling contract that Early, the contractor, could not assign it without the written consent of the Continental Oil Company was nugatory. It argues that Early was the vice president of the Boucher Oil Company when he made the contract on July 5, 1929, and that he used that company's tools in performing the contract and that it paid the expenses of the drilling enterprise. As between Early and his company it may be conceded that the latter was entitled to the proceeds of the enterprise. With that matter plaintiff has no concern. But how can it be said that the Bridgeport Machine Company should be required to stand aside for the Boucher Oil Company on account of this unknown relationship between it and Early? If the Boucher Oil Company was in fact a party in interest to the contract of July 5 from its inception, then it was charged with notice of its terms, one

of which was that Early could not assign that contract to the interpleader or anybody else without the written consent of the other party to the contract. The Boucher Oil Company was quite content to let the contract stand as written, while Early was contracting obligations on the faith that he was the responsible contractor and principal of an important and remunerative enterprise. It would therefore be manifestly unjust to suffer the plaintiff to be maneuvered out of its due by this belated claim of the interpleader.

Appellant cites cases holding that garnishment proceedings only reach the actual property of the debtor in the hands of the garnishee, not that which the debtor had theretofore assigned in good faith to others. That rule of law does not help the appellant. There had been no valid assignment of Early's claim against the Continental Oil Company when the garnishment process was served. Such assignment could only be made with the written assent of that company. Such assent had neither been given nor asked for. Appellant also invokes a rule that where the agent of an undisclosed principal makes a contract all the advantages of such contract inure to the benefit of his principal. That rule is not an invariable one. Here the drilling contract was made with Early. The Continental Oil Company was willing to let the important enterprise of drilling a 4,250-foot well to him. But it expressly stipulated that the contract was let to him personally—not to anybody else, and was not to be assigned by Early to anybody else without its written consent. Much is made in the brief of a letter purporting to have been written by Early to the Boucher Oil Company on July 6, 1929. It stated that he had obtained a drilling contract to drill an oil and gas well for the Continental Oil Company on a tract of land in Sedgwick county, "which contract was taken by me for the use and benefit of the Boucher Oil Company." The letter then proceeds—

"Consistent with our agreement [whatever that was], and in view of the fact that I am vice president of Boucher Oil Company, it is my understanding that such contract is a contract of Boucher Oil Company notwithstanding that it was taken in my name, and that all proceeds arising from such contract shall belong to Boucher Oil Company.

"It is further understood and agreed that all cost in the performance of said above-mentioned contract shall be paid by Boucher Oil Company and that Boucher Oil Company shall perform all the conditions thereof agreed by me to be performed to the same extent as though Boucher Oil Company were named contractor therein, in my place and stead.

"Very truly yours,      D. E. EARLY."

It does not appear that the trial court attached much credence to that letter—which is not surprising. The fact that it reminds the company that he is its vice president and advances the legal theory by which the interpleader now seeks to deprive the plaintiff of its advantage by the garnishment proceedings might have weighed against it, if it were otherwise entitled to controlling significance. The letter dictates what is "further understood and agreed" between Early and the Boucher Oil Company, and states that the latter "shall perform all the conditions [of the drilling contract] agreed [to] by me." Certainly the Continental Oil Company was not bound by that letter, even if its genuineness were beyond question, since its contents were not made known to it until December 20, 1929, by which time the garnishment proceedings had become effective.

Appellant directs our attention to a general rule laid down in 5 C. J. 874, 875, which holds that ordinarily the right of one party to a contract to its performance by the other party may be assigned unless such assignment is forbidden or unauthorized by the terms of the contract itself. This court fails to discern how that rule can give any aid or comfort to the interpleader.

Appellant also invokes the rule announced in some early Kansas cases like *B. & M. R. Rld. Co. v. Thompson,* 31 Kan. 180, 1 Pac. 622, which held that garnishment proceedings bind only the amount due on the date the garnishment is served and not that which is subsequently earned, even under a prior contract of employment. As we read the record a great deal more than the amount of plaintiff's claim had been earned prior to the service of the garnishment process. The well was then nearly completed, at which time a total of $16,812 was earned, so the rule invoked does not defeat the garnishment proceedings. Furthermore, the statute, R. S. 61-1222, has been critically reëxamined in recent years and the rule announced in the Thompson case, *supra,* has been liberalized. In *Anderson v. Dugger,* 130 Kan. 153, 286 Pac. 546, it was said:

"Under the provisions of R. S. 61-1222, *supra,* the garnishee is obliged to appear before the justice and answer concerning the property in his possession or under his control, and 'the amount owing by him to the judgment debtor, whether due or not.' Under this provision of the statute unmatured and contingent liabilities are properly subject to such garnishment proceedings. (*Bank v. Dondelinger,* 103 Kan. 444, 175 Pac. 109; *Winterscheidt v. Wilson,* 110 Kan. 649, 205 Pac. 600, followed.)" (Syl. ¶ 2.)

The other objections to the judgment have been carefully considered, but no further error is discerned which would justify discussion.

The judgment is affirmed.